UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KEVIN LOVETT,<br>      Plaintiff,<br><br>      v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br>      Defendant. | No. 3:17-cv-637 (SRU) |

## **RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS**

In this Social Security appeal, Kevin Lovett moves to reverse the decision by the Social Security Administration ("SSA") denying his claim for disability insurance benefits. Mot. J. on Pleadings, Doc. No. 15. The Commissioner of Social Security moves to affirm the decision. Mot. to Affirm, Doc. No. 18. For the reasons set forth below, I DENY Lovett's Motion for Judgment on the Pleadings (Doc. No. 15) and GRANT the Commissioner's Motion to Affirm its Decision (Doc. No. 18).

### I.    **Standard of Review**

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations. *Id*. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc.*

2

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II. Facts

Kevin Lovett filed applications for Social Security benefits and Supplemental Income benefits on November 14, 2014 and November 17, 2014 respectively, with an alleged onset of disability of July 15, 2011. Joint Stipulation of Facts, Doc. No. 17, at 2. However, previous applications for benefits which resulted in final decisions created an administratively imposed disability onset of October 29, 2013 based on the doctrine of *res judicata*. *Id*. at 2 n.3. At the time of the administratively imposed disability onset, Lovett was 51 years old. *Id*. at 2. Lovett identified his disability as carpal tunnel in both hands, back pain, and shoulder pain. Int'l Disability Determination Decision, R. at 186. The SSA initially denied his claim on December 11, 2014, finding that although "[his] condition result[ed] in some limitations in [his] ability to perform work related activities . . . [the SSA] determined that [his] condition [was] not severe enough to keep Lovett from working." *Id*. The SSA went on to note that it "considered the

3

medical and other information and work experience in determining how [his] condition affects [his] ability to work." *Id*. Further, the SSA stated that it did not "have sufficient vocational information to determine whether [Lovett could] perform any of [his] past relevant work," *id*., but it determined that Lovett could "adjust to other work." *Id*. Lovett was 52 at the time of the agency's denial.

Lovett sought reconsideration, stating that he disagreed with the SSA determination because he was allegedly disabled for the stated period of time. Request for Reconsideration, R. at 197. The SSA again denied his claim on reconsideration on June 24, 2015 for the same reasons it offered in its initial denial. *Id*.

Lovett requested a hearing before an Administrative Law Judge ("ALJ") on July 13, 2015, and a hearing was held before ALJ John Aletta on October 13, 2016. Tr. of ALJ Hr'g, R. at 63. At the hearing, the ALJ questioned Lovett about his conditions, treatment history, and ability to perform daily working and living functions. *Id*. at 80–89. Lovett responded that he had pain in his neck, his back, his shoulders, and his right hand that had "been there for quite a while." *Id*. at 80–81. When asked about the pain in his right hand, Lovett responded that he "[couldn't] even close it." *Id*. at 81. He further testified that he could "only walk maybe two city blocks," and he could "lift maybe ten pounds," because "[his] back gives out." *Id*. at 87. Lovett testified that he could reach overhead with both arms as long as he was not holding anything, but couldn't "put weight on [his] hands and reach above [his] head." *Id*. at 88.

Lovett testified that he tried to help around the house with cleaning and cooking, and that he did his own laundry. *Id*. at 89. Further, he did "little stuff" in the yard, including cutting the grass with a self-propelled lawn mower, but did not shovel snow in the winter. *Id*. Lovett testified that he was able to maintain his personal hygiene, stand at the sink and do dishes, and

4

vacuum the house, though it "takes him all day," because he takes frequent breaks to rest. *Id*. at 91–92, 95.

The ALJ then heard testimony from Vocational Expert Renee Jubrey, who testified that Lovett's prior work as a drywall taper, janitor, and laborer fell into the "medium" exertional level or above. Tr. of ALJ Hr'g, R. at 98–99. The ALJ asked Jubrey to consider a hypothetical individual of the same age, education (high school, *id*. at 68), and experience as Lovett, who was limited to performing work at the medium exertional level with the following additional limitations: could only occasionally reach overhead with both arms; occasionally handle and finger with their dominant hand; could frequently climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could frequently balance, stoop, kneel, and crouch; could only occasionally crawl; could never be exposed to unprotected heights or moving mechanical parts; and could not be required to twist their head more than 45 degrees to the left. *Id*. at 100. The ALJ asked Jubrey whether that hypothetical individual could perform any of Lovett's prior jobs, and she testified that they could not, primarily due to the occasional handling and fingering limitation. *Id*. Further, Jubrey testified that there were no jobs that the hypothetical person could perform in the national economy at a medium exertional level. *Id*.

The ALJ then changed the hypothetical from a "medium" to "light" exertional level while retaining the same limitations, and Jubrey testified that with that change, the following jobs were available: school bus monitor, with 20,000 jobs available in the national economy; counter clerk, with 25,000 jobs available in the national economy; or usher, with 55,000 jobs available in the national economy. *Id*. at 101–02. The ALJ modified the hypothetical again to include a complete restriction on reaching overhead with either arm, and Jubrey testified that the overhead reaching restriction would not prevent the hypothetical individual from performing the

aforementioned three jobs. *Id*. at 103–04. Finally, the ALJ included a sit/stand restriction in the same hypothetical—that is, for every ten minutes sitting, the individual would be permitted to stand for five minutes, and for every ten minutes standing, the individual would be permitted to sit for five minutes. *Id*. at 105. With that additional restriction, Jubrey testified that there would be no jobs available in the national economy for that hypothetical individual. *Id*. at 105–06.

On November 9, 2016, the ALJ issued an opinion in which he found that Lovett was not "under a disability within the meaning of the Social Security Act from July 15, 2011, through the date of this decision."[1] ALJ Decision, R. at 15. At the first step, the ALJ found that Lovett "ha[d] not engaged in substantial gainful activity since October 29, 2013, the beginning of the relevant period." *Id*. at 18. At the second step, the ALJ determined that Lovett's impairments of "bilateral carpel tunnel syndrome, right shoulder osteoarthritis, right shoulder subscapularis tendinosis, dupuytren's contracture of right hand/fourth finger, degenerative changes to left shoulder acromiclavicular joint, tear of supraspinatus of left shoulder, and mild bulging disks of cervical spine" were severe impairments that imposed "more than minimal limitations on the claimant's ability to engage in basic work activities."[2] *Id*.

At the third step, the ALJ determined that Lovett "did not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments" because "the evidence [did] not support a finding that the claimant [was] unable to perform fine and gross movements effectively." ALJ Decision, R. at 20. As support for this, the ALJ stated that Lovett "testified to activities consistent with effective fine and gross

---

[1] Although Lovett alleged 7/15/11 as the onset date, the ALJ determined that the relevant period began 10/29/13, because of res judicata, for purposes of Title II benefits. ALJ decision, R. at 17.
[2] Lovett's non-severe impairments were: Hepatitis C; "sour stomach" and nausea; degenerative disc disease; gastritis; heartburn; rectal bleeding; constipation; obesity; depression; and anxiety. ALJ Decision, R. at 18–19.

manipulation" such as daily driving, household chores, grooming, and hygiene. ALJ decision, R. at 19–20.

The ALJ then assessed Lovett's residual functional capacity, and found that he could "perform light work" with certain limitations. *Id*. at 20. The limitations were that Lovett (1) could only occasionally "reach bilaterally," (2) could only occasionally "handle and finger with the right upper extremity," (3) could frequently "climb ramps and stairs," (4) could never "climb ladders, ropes or scaffolds," (5) could frequently "balance, stoop, kneel, and crouch," (6) could "only occasionally crawl," (7) could never be exposed to unprotected heights and moving mechanical parts, and (8) could not "twist his head more than 45 degrees to the left." *Id*. The ALJ noted that Lovett alleged the following set of symptoms not addressed in the RFC determination:

> [Lovett] has pain in his neck, as well as his shoulders and right hand. The pain occurs daily and is at a level of 8.5 out of 10. He cannot close his right hand. He can only turn his neck to the right. The only way to turn left is to turn his whole body. He has to get in the fetal position in order to relieve back pain. He can only sleep for about 1–2 hours per night due to the pain. He has problems sitting and standing for long periods. He can only walk about [two] city blocks and lift about [ten] pounds. He has problems reaching with both arms. He has a tendency to drop objects. He can only reach above his head with no weight in his hands.

*Id*. at 21. The ALJ determined that Lovett's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id*. However, the ALJ decided that "[Lovett's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id*.

At the fourth step, the ALJ determined that Lovett could not perform his past relevant work as a taper, janitor, or construction worker. *Id*. at 24. At the fifth step, the ALJ determined that, based on Lovett's age, education, work experience, and residual functional capacity, "there

[were] jobs that exist[ed] in significant numbers in the national economy that [Lovett could] perform." *Id*. at 25. Because the ALJ found that Lovett was capable of making a successful adjustment to other work, he concluded that "a finding of 'not disabled' [was] therefore appropriate" and denied Lovett's request for disability benefits. *Id*.

Lovett requested a review of the ALJ's decision by the SSA's Appeals Council on December 2, 2016. Request for Review of Hearing Decision/Order, R. at 8. The SSA Appeals Council "found no reason . . . to review either the dismissal action or the decision of the [ALJ]," and denied Lovett's request for review. Notice of Appeals Council Action, R. at 1. Lovett then filed a complaint before this court urging reversal of the Commissioner's decision on April 17, 2017. Compl., Doc. No. 1. Lovett filed a Motion to Reverse on September 19, 2017. Mot. Rev., Doc. No. 15. The Commissioner filed a Motion to Affirm on October 10, 2017. Mot. Affirm, Doc. No. 18.

**III.     Discussion**

On review, Lovett argues that the ALJ failed to properly evaluate Lovett's testimony and failed to properly weigh the medical opinion evidence in order to determine Lovett's residual functional capacity. Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No 16, at 2. Specifically, Lovett alleges that the ALJ failed to follow the treating physician rule when he assigned "substantial weight" to a state agency medical consultant's non-examining report, *id*. at 3, and improperly relied on Lovett's treatment history and ability to perform activities of daily living when making a credibility determination. *Id*. at 10–12. The Commissioner responds that the ALJ's "findings are supported by substantial evidence and made by a correct application of legal principles," and should therefore be affirmed. Mot. to Affirm, Doc. No. 18, at 1.

8

A. <u>Did the ALJ correctly evaluate Lovett's testimony?</u>

Lovett argues that the ALJ's credibility determination was "fatally flawed" due to his analysis of Lovett's employment history, treatment history, and daily activities. Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No 16, at 11–13. The Commissioner responds that "the ALJ properly assessed [Lovett's] subjective complaints, and noted inconsistencies in [his] allegations." Mot. to Affirm, Doc. No. 18, at 7. I agree with the Commissioner.

SSA regulations "provide a two-step process for evaluating a claimant's assertions of pain and other limitations." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record," after taking into account "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." *Id.* (quoting 20 C.F.R. § 404.1512(b)(1)(iii)).

Under SSA regulations, "[w]hen determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account." *Genier*, 606 F.3d at 49. The ALJ is not, however, "required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* "Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are patently

unreasonable." *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted); *see Aponte*, 728 F.2d at 591 ("If the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."). Ultimately, "[a]s a fact-finder, the ALJ has the discretion to evaluate the credibility of a claimant," *Pietrunti*, 119 F.3d at 1042 (internal quotation marks omitted), and "[i]t is the function of the [ALJ], not the reviewing courts . . . to appraise the credibility of witnesses, including the claimant." *Aponte*, 728 F.2d at 591. In the present case, the ALJ's credibility findings were not "patently unreasonable" or unsupported by "substantial evidence." *See Pietrunti*, 119 F.3d at 1042; *Aponte*, 728 F.2d at 591.

In the first step, the ALJ determined that Lovett's medically determinable impairments could reasonably be expected to cause the alleged symptoms. ALJ Decision, R. at 21. However, at the second step the ALJ found that Lovett's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id*. In so finding, the ALJ did not give controlling weight to the opinion of Lovett's primary care provider, Dr. DeGaetano, who concluded that Lovett was only able to sit for four hours, stand and walk for two hours, would need frequent breaks during the workday due to his symptoms' interference with his concentration, and would likely be absent from work for three days each month. *Id*. The ALJ found that those opinions by Dr. DeGaetano were "especially poorly supported." *Id*.

Further, the ALJ highlighted inconsistencies in Lovett's work history as support for his determination. The ALJ opined that Lovett had likely been laid off from his previous jobs, as opposed to stopping work due to his conditions. ALJ Decision, R. at 22. For example, Lovett testified that he was laid off from his job on the alleged disability onset date of July 15, 2011, but

also indicated on his disability report that he stopped working on August 13, 2010, despite his claim that he "became unable to work on March 15, 2002." *Id*. Further, the ALJ noted that Lovett had previously stated that he did not work because of his disabilities. *Id*. The ALJ concluded that Lovett's "history does not support the primary care provider's opinion suggesting an inability to sustain work." *Id*. Lovett argues that conflicting dates regarding when and why he stopped working in 2010 and 2011 "[are] irrelevant since the current claim only concerns whether Lovett is disabled since October 29, 2013." Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No 16, at 11. However, the ALJ did not consider Lovett's work history and conflicting statements to determine whether Lovett was disabled; rather, the ALJ simply concluded that the contradictions in Lovett's work history did not offer any support to Dr. DeGaetano's opinion that Lovett would have difficulty sustaining work.

The ALJ also reviewed Lovett's daily activities, noting that they "indicate a high degree of independence, which tends to support the state agency assessment, particularly with respect to fine and gross manipulation." ALJ Decision, R. at 22. The ALJ highlighted that Lovett was able to drive every day, tried to do chores, and did laundry, dishes, vacuuming, and yard work in short spurts. *Id*. Lovett maintained his grooming and hygiene, could use a self-propelled lawnmower, and could shop for groceries while leaning on the cart. *Id*. Although a "[plaintiff] need not be an invalid to be entitled to benefits," *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988), a relatively high level of activity can factor into a credibility finding with regard to a claimant's subjective assessment of the intensity of his symptoms. *See Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order); *Johnson v. Berryhill*, 2017 WL 2381272, at *8 (D. Conn. 2017). Further, Lovett testified that he could not take pain medication due to his liver. ALJ

Decision, R. at 22. The ALJ reasoned that Lovett's activity level "suggest[ed] that his pain [was] not as severe as alleged." *Id*.

The ALJ noted that Lovett's "apparent lack of enthusiasm for treatment" also indicated that his pain was not as severe as alleged. *Id*. Lovett had bilateral surgical corrections for his carpal tunnel syndrome and related impairments in October and November 2014, and during a follow-up appointment he "clashed with his surgeon when he was told that he would only be kept out of work for 6–8 weeks, rather than 4–5 months as he expected." ALJ Decision, R. at 22. His last visit with that provider was in January 2015, where he exhibited a loss of flexion in all fingers of his right hand, and complained that his fingers were "as swollen as a balloon." *Id*. The surgeon "observed minimal swelling," however, and "indicated that [Lovett] did not put effort into the examination." *Id*. In July of 2015 Lovett told his primary care physician that he "would not go back to the orthopedist because he didn't like him." *Id*. Lovett was referred to a second orthopedist, but did not follow up. *Id*.

With respect to Lovett's bilateral shoulder impairments, the ALJ noted that the treatment Lovett sought had been "sporadic and conservative." ALJ Decision, R. at 23. Lovett "never sought specialist treatment, despite referrals," and other than at his first primary care visit and one in January 2016, "his examinations were unremarkable with respect to the shoulder." *Id*. At that January 2016 visit, Lovett reported having trouble lifting heavy objects with both hands, and had "positive findings in both shoulders." *Id*. He was referred to physical therapy, but he only went to several sessions over a period of one month before he stopped attending. *Id*. "He was discharged about [four] months after his final visit." *Id*. The ALJ concluded that Lovett's treatment history "tends to support the state agency opinion indicating an ability to work and lift heavier objects." *Id*.

With respect to Lovett's degenerative disk disease of the neck with attendant headaches, the ALJ noted that "treatment . . . was largely the same as for his lumbar spine: minimal with no specialist treatment." ALJ Decision, R. at 23. Lovett's "complaints were more prominent with respect to the neck than the back," but the ALJ concluded that "[those] complaints are not well supported by objective findings." *Id*. The ALJ concluded that Lovett's primary care physician's notes "indicate[d] no loss of gait, loss of range of motion, or other indication consistent with difficulty standing or walking. He also never indicated any problems sitting." *Id*. Therefore, the ALJ reasoned that "[this] contradicts the primary care provider opinion indicating significant limitations in all of these functions." *Id*.

The ALJ's conclusions regarding Lovett's testimony and the supporting opinion of his primary care physician were not "patently unreasonable" nor were they unsupported by "substantial evidence." The ALJ provided specific reasons for his credibility determination, including that Lovett's subjective testimony and Dr. DeGaetano's supporting opinion were not corroborated by Lovett's reported daily activities or the objective evidence, namely, his treatment and work history. It is the ALJ's role to determine credibility issues, and, here, his decision was "sufficiently specific" in making clear the reasoning for his finding regarding Lovett's credibility. *Cichocki*, 534 F. App'x at 75-76. Accordingly, the ALJ did not err in his decision to assign little weight to Lovett's testimony and the related portions of Dr. DeGaetano's opinion.

B. Did the ALJ correctly evaluate the medical opinion evidence?

Lovett argues that the ALJ failed to follow the treating physician rule when he decided that Lovett's treating physician's opinion was not entitled to controlling weight, and instead assigned "substantial weight" to a non-examining state agency medical consultant's report. Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No. 16, at 2–3. The Commissioner responds that the

13

ALJ "cited several good reasons for giving [the treating physician's] opinions little weight, and thoroughly explained his reasoning." Mot. to Affirm, Doc. No. 18, at 3.

"The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [the] case record."[3] *Cichocki v. Astrue*, 534 F. App'x 71, 74 (2d Cir. 2013) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ gives controlling weight to a non-treating physician, and does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a[n] … opinion," *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004), and provide "good reasons" for the weight assigned. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). But "where the ALJ's reasoning and adherence to the regulation are clear," he need not "slavish[ly] recite[] each and every factor" listed in the regulations. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order). Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner"—not the court—"to resolve." *Burgess*, 537 F.3d at 128.

---

[3] Originally a rule devised by the federal courts, the treating physician rule is now codified by SSA regulations, but "the regulations accord less deference to unsupported treating physician's opinions than d[id] [the Second Circuit's] decisions." *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," and has advised that, ordinarily, "a consulting physician's opinions or reports should be given little weight." *Selian*, 708 F.3d at 419; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In some circumstances, however, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute … substantial evidence").

An ALJ is entitled to rely on the opinions of state agency medical consultants in issuing decisions. *See Social Security Ruling 96-6p*, 1996 WL 374180 (1996). Here, the ALJ certainly relied on Dr. Papantonio's assessment from the reconsideration level, along with the "consistent portions of the primary care provider's opinion." ALJ Decision, R. at 24. When determining Lovett's residual functional capacity, the ALJ adopted most of the limitations recommended by treating physician Dr. DeGaetano. Significantly, however, the ALJ substituted the limitations in sitting, standing, and walking recommended by state agency medical consultant Dr. Papantonio, finding that Dr. DeGaetano's opinions concerning those functions were poorly supported. ALJ Decision, R. at 21.

Lovett argues that the ALJ cited no medical opinions or other authority supporting the rejection of Dr. DeGaetano's recommended limitations on sitting, standing, and walking. Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No. 16, at 3. However, Dr. Papantonio's consultative report is a "neutral, acceptable medical source," ALJ Decision, R. at 21, and the ALJ was entitled to rely upon it to determine Lovett's residual functional capacity. Moreover, as discussed

15

above, evidence in the record of Lovett's daily activities and treatment history constitute substantial "other authorities" which the ALJ properly considered before rejecting Dr. DeGaetano's recommended limitations.

Lovett characterizes the ALJ's reliance on Dr. Papantonio's report as "particularly egregious," because "[t]he opinions from the non-examining consultant who is not a specialist in a relevant area of medicine and who reviewed a markedly undeveloped record cannot be given greater weight than the well-supported opinions from a treating doctor, such as Dr. DeGaetano here." Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No. 16, at 4–5. First, though Dr. Papantonio is not a specialist in a relevant area of medicine, he need not be for his opinion to be relevant to the ALJ's analysis; indeed, "[s]tate agency medical . . . consultants . . . are experts in the Social Security disability programs," and "[i]n appropriate circumstances, [their] opinions may be entitled to greater weight than the opinions of treating or examining sources." SSR 90-6p, 1996 WL 374180, at *2–3. Second, while Dr. Papantonio's report predated that of treating physician DeGaetano's, Dr. Papantonio reviewed medical records through February 2015 which included records from Dr. DeGaetano's medical group. Evidence of Record, R. at 154–57, 166–69. Further, Lovett does not point to any medical records or evidence after February 2015 which would be relevant to the ALJ's residual functional capacity determination with regard to his ability to sit, stand, or walk. Finally, in light of Lovett's daily activities, work history, and treatment history, the ALJ determined that the sitting, standing, and walking portions of Dr. DeGaetano's recommendations were not well-supported.

Lovett argues that because the ALJ did not rely *entirely* on state agency medical consultant Dr. Papantonio's recommendations when determining Lovett's residual functional capacity, "[t]he ALJ could not purport to rely on a medical opinion while at the same time

16

rejecting the conclusions reached regarding the claimant's level of functioning." Mem. in Supp. Pl.'s Mot. J. Pleadings, Doc. No. 16, at 5. However, when determining a claimant's residual functional capacity, an ALJ is required to consider "all the relevant medical and other evidence of record." 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a). Lovett's contention that the ALJ could not rely on more than one doctor's recommendations when analyzing different aspects of Lovett's residual functional capacity is without merit.

The ALJ comprehensively stated his reasons for incorporating different aspects of both Dr. DeGaetano and Dr. Papantonio's recommendations when he determined Lovett's residual functional capacity, and he provided good reasons for his decision to do so, such that it is possible to "review meaningfully those [RFC] conclusions." *Cichocki*, 729 F.3d at 177. Accordingly, the ALJ did not violate the treating physician rule when determining Lovett's residual functional capacity.

**IV.     Conclusion**

For the reasons set forth above, the Commissioner's Motion to Affirm (Doc. No. 18) is **GRANTED**, and Lovett's Motion for Judgment on the Pleadings (Doc. No. 15) is **DENIED**. The Clerk shall enter judgment and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of September 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge